IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| JACK T. MEROD, | ) |
| | ) |
|        Plaintiff, | ) |
| | ) |
| vs. | ) Civil No.  15-cv-559-CJP[1] |
| | ) |
| CAROLYN W. COLVIN, | ) |
| Acting Commissioner of Social | ) |
| Security, | ) |
| | ) |
|        Defendant. | ) |

**MEMORANDUM and ORDER**

**PROUD, Magistrate Judge:**

In accordance with 42 U.S.C. § 405(g), plaintiff Jack Merod is before the Court, represented by counsel, seeking review of the final decision of the Commissioner of Social Security denying him Disability Insurance Benefits (DIB).

**Procedural History**

Plaintiff applied for benefits on March 17, 2011, alleging disability beginning on August 9, 2010. (Tr. 10-20). ALJ Robert S. Robison held an initial evidentiary hearing on May 2, 2013 and thereafter found plaintiff to be disabled in a decision dated July 8, 2013. (Tr. 67-115, 127-32). The Appeals Council determined this finding was unsupported by substantial evidence and reversed the ALJ's decision. (Tr. 134-37). After holding a second evidentiary hearing,

---

[1] This case was referred to the undersigned for final disposition upon consent of the parties, pursuant to 28 U.S.C. §636(c).  See, Doc. 7.

ALJ Robison denied plaintiff's application in a written decision dated June 9, 2014. (Tr. 10-20). The Appeals Council denied review, and the decision of the ALJ became the final agency decision. (Tr. 1). Administrative remedies have been exhausted and a timely complaint was filed in this Court.

## Issues Raised by Plaintiff

Plaintiff raises the following points:

1. The ALJ erred in forming plaintiff's RFC by failing to account for plaintiff's deficiencies in concentration, persistence, or pace.

2. The ALJ erred by relying upon vocational expert testimony that was in response to hypothetical questions that failed to include the task-complexity element of the RFC finding.

## Applicable Legal Standards

To qualify for DIB, a claimant must be disabled within the meaning of the applicable statutes. For these purposes, "disabled" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." **42 U.S.C. §423(d)(1)(A).**

A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques. **42 U.S.C. §423(d)(3).** "Substantial gainful activity" is work activity that involves doing significant physical or mental activities, and that is done for pay or profit. **20 C.F.R. §§ 404.1572.**

Social Security regulations set forth a sequential five-step inquiry to

determine whether a claimant is disabled. The Seventh Circuit Court of Appeals has explained this process as follows:

> The first step considers whether the applicant is engaging in substantial gainful activity. The second step evaluates whether an alleged physical or mental impairment is severe, medically determinable, and meets a durational requirement. The third step compares the impairment to a list of impairments that are considered conclusively disabling. If the impairment meets or equals one of the listed impairments, then the applicant is considered disabled; if the impairment does not meet or equal a listed impairment, then the evaluation continues. The fourth step assesses an applicant's residual functional capacity (RFC) and ability to engage in past relevant work. If an applicant can engage in past relevant work, he is not disabled. The fifth step assesses the applicant's RFC, as well as his age, education, and work experience to determine whether the applicant can engage in other work. If the applicant can engage in other work, he is not disabled.

***Weatherbee v. Astrue*, 649 F.3d 565, 568-569 (7th Cir. 2011).**

Stated another way, it must be determined: (1) whether the claimant is presently unemployed; (2) whether the claimant has an impairment or combination of impairments that is serious; (3) whether the impairments meet or equal one of the listed impairments acknowledged to be conclusively disabling; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing any work within the economy, given his or her age, education and work experience. **20 C.F.R. §§ 404.1520; *Simila v. Astrue*, 573 F.3d 503, 512-513 (7th Cir. 2009); *Schroeter v. Sullivan*, 977 F.2d 391, 393 (7th Cir. 1992).**

If the answer at steps one and two is "yes," the claimant will automatically be found disabled if he or she suffers from a listed impairment, determined at step three. If the claimant does not have a listed impairment at

step three, and cannot perform his or her past work (step four), the burden shifts to the Commissioner at step five to show that the claimant can perform some other job. **Rhoderick v. Heckler, 737 F.2d 714, 715 (7th Cir. 1984). See also Zurawski v. Halter, 245 F.3d 881, 886 (7th Cir. 2001**)(Under the five-step evaluation, an "affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled…. If a claimant reaches step 5, the burden shifts to the ALJ to establish that the claimant is capable of performing work in the national economy.").

This Court reviews the Commissioner's decision to ensure that the decision is supported by substantial evidence and that no mistakes of law were made.  It is important to recognize that the scope of review is limited.  "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." **42 U.S.C. § 405(g)**.  Thus, this Court must determine not whether plaintiff was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made. **See, Books v. Chater, 91 F.3d 972, 977-78 (7th Cir. 1996)** (citing **Diaz v. Chater, 55 F.3d 300, 306 (7th Cir. 1995)**).  This Court uses the Supreme Court's definition of substantial evidence, i.e., "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." **Richardson v. Perales, 91 S. Ct. 1420, 1427 (1971).**

In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does <u>not</u> reweigh evidence, resolve

4

conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. **Brewer v. Chater, 103 F.3d 1384, 1390 (7th Cir. 1997)**. However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner. See, **Parker v. Astrue, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.**

## The Decision of the ALJ

ALJ Robison followed the five-step analytical framework described above. He determined that plaintiff had not been engaged in substantial gainful activity since his alleged onset date. He found that plaintiff had severe impairments of depression with psychosis, anxiety with panic attacks, and untreated hypertension. The ALJ further determined these impairments do not meet or equal a listed impairment. (Tr. 22).

The ALJ found that plaintiff had the residual functional capacity (RFC) to perform a full range of work at all exertional levels, but with physical and mental limitations. (Tr. 14). Based on the testimony of a vocational expert (VE), the ALJ found that plaintiff was not able to perform his past work. (Tr. 19). However, he was not disabled because he was able to do other jobs which exist in significant numbers in the regional and national economies. (Tr. 19-20).

## The Evidentiary Record

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order. The following summary of the record is directed to the points raised by plaintiff.

1. **Agency Forms**

Plaintiff was born on June 9, 1952, and was fifty-eight years old on the alleged onset date of August 9, 2010. He was insured for DIB through March 31, 2018. (Tr. 328). He completed three years of college and had specialized training in heating and cooling systems. Prior to plaintiff's alleged onset date, he performed maintenance work at a grocery store for fifteen years. (Tr. 332).

Plaintiff claimed that his schizophrenia, depression, anxiety, panic disorder, high blood pressure, and hemorrhoids limited his ability to work. (Tr. 331). He took Citalopram and Fluoxetine for depression, Haloperidol for schizophrenia, and Hydrochlorothiazide for high blood pressure. (Tr. 334, 367).

Plaintiff completed function reports in May and August of 2011. (Tr. 346-51, 371-76). He stated that he woke up around 7:30 a.m., ate, took his medication, and then went for a half mile walk. (Tr. 346, 371). He did not cook and his wife performed most of the household chores. (Tr. 347, 372). He was able to drive, shop for groceries, and handle his finances. (Tr. 348, 373). Plaintiff read, listened to the radio, and spent time with his wife, but he was no longer able to go fishing or boating. (Tr. 348-49, 373-74). Plaintiff claimed to have difficulty lifting, squatting, bending, sitting, kneeling, hearing, remembering, completing tasks, concentrating, understanding, following instructions, and getting along with others. (Tr. 349-50, 374-75). He stated that he needed to write down spoken instructions as a result of his memory problems. He was fired from a previous job for arguing with coworkers and could not concentrate when he was stressed. (Tr. 350, 375).

In April 2011, plaintiff's wife also completed a function report. (Tr. 338-45). She stated that plaintiff had difficulty concentrating and he quickly lost interest in any activity he performed. (Tr. 338). Plaintiff's wife stated that on a daily basis, plaintiff ate breakfast, completed a puzzle, read the sports page in the newspaper, goes for a walk, ate lunch, used his computer, ate dinner, and watched television. (Tr. 339). Plaintiff helped care for their dog and was able to prepare simple meals. (Tr. 339-40). She stated that plaintiff went to sleep early but he was not able to stay asleep. (Tr. 339). Plaintiff's wife noted that plaintiff could perform most household chores but he did not perform them because he had no interest. (Tr. 340). Plaintiff could drive, was able to shop in stores, and could handle the finances. (Tr. 341). She stated plaintiff had difficulty remembering, completing tasks, concentrating, understanding, following instructions, and getting along with others. (Tr. 343).

**2. Evidentiary Hearings**

Plaintiff had two evidentiary hearings. He was not represented by an attorney at his first hearing on May 2, 2013. (Tr. 67-115). Plaintiff stated he understood his rights to representation and that he wanted to represent himself at the hearing. (Tr. 72-5). He was sixty years old at the time of the hearing, five feet seven inches tall, and weighed one hundred and sixty-seven pounds. (Tr. 79). Plaintiff completed five years of college but did not obtain a degree. (Tr. 82). He last worked on August 9, 2010 and had training in heating, cooling, and refrigeration. (Tr. 71, 78). He felt that mental fatigue kept him

7

from obtaining a job similar to his previous work, and his memory problems made him unable to perform a different type of job. (Tr. 103).

Plaintiff stated that the majority of his problems were related to mental illness and not physical ailments. (Tr. 80-81). He did not have health insurance and went to free clinics when he needed medical care. (Tr. 81). He testified that he needed more mental health treatment but he did not need more care for his physical impairments. (Tr. 81-82). He was taking Celexa and Flexeril at the time of the hearing. (Tr. 68). He stated that he did not have difficulty dealing with people on a short term basis but he had a history of anger issues at work. (Tr. 88-89).

Plaintiff testified that he woke up every day around 6 a.m., ate breakfast, and went for a mile and a half walk. (Tr. 87). He read the sports page of the newspaper regularly and used the computer to play card games. (Tr. 84-85). He prepared cereal and coffee for himself every morning. (Tr. 93). He was able to perform household chores but his wife typically performed those tasks. (Tr. 93-94). His dog died two years ago and he could not afford to get another. (Tr. 87).

A vocational expert (VE) also testified. (Tr. 104-09). The ALJ asked the VE a series of hypothetical questions. (Tr. 105-09). At the end of the hearing the ALJ stated that he wanted a fully developed record before making his determination. The ALJ set up a mental consultative examination and an internal medicine examination to address all of plaintiff's potential ailments. (Tr. 110-12).

Plaintiff had a second evidentiary hearing on June 2, 2014 after his initial decision was vacated by the Appeals Council. (Tr. 26-64). Plaintiff was represented by an attorney at his second hearing. (Tr. 28). Plaintiff testified that his source of income at the time of this hearing was a social security check. (Tr. 30). He was sixty-two years old at the time of the hearing. (Tr. 35).

Plaintiff testified that he was helping care for his father in Florida. He drove down to see him several times in the previous year. (Tr. 32). However, he took the MetroLink to the hearing because he did not like driving in cities. (Tr. 37). He had difficulty with loud noises and installed Plexiglas over his windows to reduce the volume of external noise. (Tr. 46).

Plaintiff's records indicated he had a history of schizophrenia, anxiety, depression, and high blood pressure. (Tr. 30-31). At the time of the hearing, he was taking Latuda for depression and Cyclobenzaprine as a muscle relaxer. (Tr. 34). He had to take his medications in the afternoon because they made him drowsy. (Tr. 44). He stated that he mowed the lawn but his wife performed most of the household chores. (Tr. 35). He felt he was unable to concentrate adequately enough to read books, newspapers, or magazines. (Tr. 38). He talked to his sons about once a month each, and saw one of his friends once a week. Plaintiff stated that he cried about once a week because of his depression. (Tr. 43-44).

The ALJ noted that plaintiff's medical record indicated that at the time of his previous hearing he was not taking his medication as prescribed so that he

would be more depressed at the hearing. (Tr. 52-53). Plaintiff stated that he occasionally tried to overcome his issues without medication. (Tr. 53).

A VE also testified at plaintiff's second hearing. (Tr. 54). The ALJ asked the VE a hypothetical question where a person of plaintiff's age, educational level, and work experience could perform work at all exertional levels. However, the person could never climb ladders, ropes, or scaffolds; could only have occasional interaction with the general public; could have no negotiation, supervision of others, mediation, arbitration, or dealing with customer complaints; and needed to have tacit instructions with an SVP:2 or less. (Tr. 58). The VE testified that this person could not perform plaintiff's previous work. However, he could perform jobs that existed in significant numbers in the national economy. Examples of such jobs are stacker, garment sorter, and inspector. (Tr. 58-59). The VE testified that if the person was restricted to no interaction with the general public the jobs would remain. (Tr. 59).

### 3. Medical Evidence

Plaintiff's records begin in July 2010 with Dr. Doug Despain. Plaintiff had stopped taking his prescription for Celexa because he did not think it helped him. He reported anxiety, light-headedness, and headaches. Dr. Despain advised plaintiff to perform some range of motion exercises and follow-up in a month. (Tr. 407). In August 2010, plaintiff was fired from his job and he reported sadness, anxiety, and occasionally had suicidal ideation. When Dr. Despain asked how plaintiff would commit suicide plaintiff stated he would shoot himself. Dr. Despain advised plaintiff to call 911 if he ever truly

contemplated suicide, and prescribed plaintiff Wellbutrin. (Tr. 406). Plaintiff's records contain an eight point letter plaintiff wrote about his time working at Schnuck's Markets. The letter is not entirely understandable and alleges that plaintiff's coworkers created a conspiracy to have plaintiff fired. (Tr. 409-10).

Plaintiff saw Dr. Despain two more times on record. In September 2010, plaintiff reported thinking the Wellbutrin had helped and his depression was getting better. However, in February 2011, plaintiff presented to Dr. Despain upset and tearful about his firing and blamed Dr. Despain. He was having suicidal ideation again and Dr. Despain had plaintiff's wife come to the appointment and take plaintiff to the emergency room. (Tr. 404). Plaintiff was admitted to the psychiatric unit at St. Elizabeth's hospital for four days. (Tr. 413-30). Plaintiff reported having insomnia, poor concentration, anhedonia, crying spells, and hopelessness. He was diagnosed with major depression with psychotic features, potentially schizophrenia of a chronic undifferentiated type, and chronic mental illness. He was assigned a GAF score of 30. [2] (Tr. 413, 416). Plaintiff stated he did not want to see Dr. Despain again and the doctors at the hospital started plaintiff on Prozac. They also provided plaintiff a referral for a psychiatrist, Dr. Christopher Johnson, at Windsor Care. (Tr. 414).

Plaintiff began regularly seeing Dr. Johnson in March 2011. (Tr. 461). Dr. Johnson diagnosed plaintiff with major depression, recurrent and severe and

---

[2] The GAF is determined on a scale of 1 to 100 and reflects the clinician's judgment of an individual's overall level of functioning, taking into consideration psychological, social, and occupational functioning. Impairment in functioning due to physical or environmental limitations are not considered. *American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders* - Fourth Edition, Text Revision 32-33 (4th ed. 2000); Although the American Psychiatric Association recently discontinued use of the GAF metric, it was still in use during the period plaintiff's examinations occurred.

prescribed Celexa. He also referred plaintiff to therapy and discussed a safety plan if plaintiff had suicidal thoughts again. (Tr. 462). Plaintiff had several appointments with Dr. Johnson through November 2013. (Tr. 463-65, 493-509). Plaintiff's depressive symptoms repeatedly would improve, plaintiff would stop taking his medications, and then he would become severely depressed again. (Tr. 463-65, 493, 499, 501). Dr. Johnson regularly prescribed Celexa, and diagnosed plaintiff with major depression recurrent and severe. (Tr. 493, 499, 502). Plaintiff occasionally had rambling thoughts, tangential speech, paranoid thoughts, blunted affect, and decreased insight. (Tr. 493-99).

In October 2013, plaintiff was again admitted to St. Elizabeth's hospital psychiatric unit for psychosis and suicidal ideation. (Tr. 516-31). On discharge, he was diagnosed with severe recurrent major depression with psychotic features and the doctors indicated paranoid schizophrenia could not be ruled out. He was prescribed several medications and was directed to follow up with Dr. Johnson and to contact a mental health institution for counseling. (Tr. 529).

**4. Consultative Examination**

Plaintiff had his first psychological consultative examination in June 2011. (Tr. 430-34). State agency psychologist Gregory Rudolph performed the examination and opined that plaintiff was capable of managing his financial resources but his prognosis and insight were limited. (Tr. 430). Plaintiff's mood and affect were appropriate and he was oriented to reality. His memory, information, and judgement were adequate. (Tr. 432). Dr. Rudolph's diagnoses

were major depressive disorder with suicidal ideation, anxiety disorder with panic attacks, and a GAF score of 50. (Tr. 430).

Plaintiff underwent a second psychological consultative examination in March 2013 with Dr. Harry J. Deppe. (Tr. 472-79). Dr. Deppe found that plaintiff had mild restrictions in his ability to understand, remember, and carry out simple instructions; to make judgments on simple work-related decisions; and to interact appropriately with the public. Dr. Deppe opined that plaintiff had moderate restrictions in his ability to understand, remember, and carry out complex instructions; to make judgments on complex work-related decisions; to interact appropriately with supervisors and coworkers; and to respond appropriately to usual work situations and changes in a routine work setting. (Tr. 477-78). Dr. Deppe's diagnoses were psychosis, brief episode, in remission and major depression, single episode. (Tr. 475).

Plaintiff had a physical consultative examination in May 2013 with Dr. Vittal Chapa. (Tr. 481-92). He felt plaintiff could occasionally lift or carry up to one hundred pounds and frequently carry anything under fifty pounds. (Tr. 481). Dr. Chapa stated that plaintiff could sit for eight hours out of an eight hour work-day, stand for six hours in an eight hour work-day, and walk for three hours in an eight hour work-day. (Tr. 482). Dr. Chapa opined that plaintiff could perform all other postural activities frequently. (Tr. 483-86). His diagnostic impressions were vague abdominal pain of an unknown etiology and a decreased range of motion in the right shoulder. (Tr. 490).

**5. RFC Assessments**

13

State agency psychologist Howard Tin assessed plaintiff's mental RFC in June 2011. (Tr. 449-51). He reviewed plaintiff's records but did not examine plaintiff. He found that plaintiff was moderately limited in his ability to understand and remember detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; work in coordination with or proximity to others without being distracted by them; and to interact appropriately with the general public. (Tr. 449-50).

State agency physician Julio Pardo, M.D. assessed plaintiff's physical RFC in June 2011. (Tr. 454-60). He also reviewed medical records but did not examine plaintiff. He believed plaintiff could occasionally lift and carry fifty pounds, and frequently lift or carry twenty-five pounds. He felt plaintiff could sit, stand, or walk for a total of six hours out of an eight hour workday. (Tr. 454). He did not find any other limitations regarding plaintiff's physical capabilities. (Tr. 454-60).

## Analysis

Plaintiff claims the ALJ erred in failing to account for plaintiff's moderate difficulties in concentration, persistence, or pace within the RFC assessment. Plaintiff also argues that the ALJ erred by relying upon vocational expert testimony that was in response to hypothetical questions that failed to include the task-complexity element of the RFC finding.

A claimant's RFC is "the most [the claimant] can still do despite [his or her] limitations." **20 C.F.R. § 404.1545(a)(1)**. In other words, RFC is the

claimant's "maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis," which means eight hours a day for five days a week, or an equivalent work schedule. **Social Security Ruling 96-8P, 1996 WL 374184, at \*2 (July 2, 1996) ("S.S.R. 96-8P")**; *Pepper v. Colvin*, **712 F.3d 351, 362 (7th Cir. 2013).**

In assessing a claimant's RFC, the ALJ must consider *all* of the relevant evidence in the record, and provide a "narrative discussion" that cites to specific evidence and describes how that evidence supports the assessment. The ALJ's analysis and discussion should be thorough and "[s]et forth a logical explanation of the effects of the symptoms, including pain, on the individual's ability to work." **S.S.R. 96-8, at \*5, 7**. Additionally, the Seventh Circuit has held that an ALJ's assessment must evaluate "evidence of impairments that are not severe" and "must analyze a claimant's impairments in combination." *Arnett v. Astrue*, **676 F.3d 586, 591-92 (7th Cir. 2012),** *Terry v. Astrue*, **580 F.3d 471, 477 (7th Cir. 2009),** *Craft v. Astrue*, **539 F.3d 668, 676 (7th Cir. 2008).**

Plaintiff presents several arguments regarding the ALJ's consideration of plaintiff's deficits in concentration, persistence, or pace. First, plaintiff contends that that the ALJ failed to specify which of the three aspects of functioning (concentration, persistence, or pace) were limited within his finding of a moderate impairment. The Commissioner states that it was unnecessary for the ALJ to parse out the specific areas of concentration, persistence, or pace where plaintiff had moderate limitations. She notes that the ALJ's

15

determination as to whether plaintiff has limitations in concentration, persistence, or pace is a threshold inquiry that relates to whether plaintiff has a severe mental impairment. If a claimant has more than a mild limitation in a general area, then they are considered to have a severe mental impairment. If an impairment is severe, the ALJ then has to determine if it meets or is equivalent in severity to a listed mental disorder. If the impairment does not meet or equal a listing, then the ALJ is required to assess the claimant's RFC. **20 C.F.R. 404.1520a(a)-(e)**. The Commissioner argues that the ALJ followed these steps appropriately and committed no error.

The Court agrees with the Commissioner's claim that the ALJ did not need to specify which limitation under concentration, persistence, or pace plaintiff suffered from in his analysis. His determination that plaintiff had a moderate limitation merely meant that he must account for this within plaintiff's RFC assessment if the impairments did not equal a listing. However, the Court disagrees with the Commissioner's statement that the ALJ made no error in his ultimate RFC assessment. Plaintiff's argument that the ALJ did not appropriately include a functional deficit within his RFC assessment that is attributable to plaintiff's moderate impairments within concentration, persistence, or pace is well taken.

Plaintiff cites the Seventh Circuit's recent opinions in ***O'Connor-Spinner v. Astrue*** and ***Yurt v. Colvin*** to support his claim that the RFC's restrictions were not sufficient for plaintiff's deficits in concentration, persistence, or pace. **627 F.3d 614 (7th Cir. 2010); 758 F.3d 850 (7th Cir. 2014); 794 F.3d 809**

16

**(7th Cir. 2015).** In ***O'Connor-Spinner***, the Court found that the ALJ needed to orient the VE to all of a claimant's limitations, including deficiencies in concentration, persistence, or pace. The Court stated that there is no per se requirement that the phrase "concentration, persistence and pace" be used in the hypothetical, but it went on to hold that the restriction to simple, repetitive tasks is not an adequate substitute because it "will not necessarily exclude from the VE's consideration those positions that present significant problems of concentration, persistence and pace." ***O'Connor-Spinner*, 627 F.3d at 620-21.**

In ***Yurt***, the Court stated "[W]e have repeatedly rejected the notion that a hypothetical like the one here confining the claimant to simple, routine tasks and limited interactions with others adequately captures temperamental deficiencies and limitations in concentration, persistence, and pace." ***Yurt*, 758 F.3d at 859.** Under ***Yurt*** and ***O'Connor-Spinner***, if a claimant has moderate limitations in maintaining concentration, persistence and pace, those limitations must be spelled out in the RFC assessment and in the hypothetical question posed to the VE.

The Commissioner argues that the ALJ's findings were in line with the reviewing state agency physicians' opinions and that the restrictions the ALJ posed in his hypotheticals encapsulated all of plaintiff's limitations. Dr. Tin found that plaintiff had difficulty carrying out detailed instructions, maintaining attention and concentration for extended periods, and should have no interaction with the general public. He also stated that plaintiff could perform simple tasks and could respond appropriately to changes in work

settings. (Tr. 451). Dr. Deppe found that plaintiff had moderate limitations in his abilities to understand, remember, carry out, or make judgments regarding complex instructions. Dr. Deppe stated plaintiff could manage simple instructions but he had moderate limitations in interacting with coworkers and supervisors. (Tr. 477).

The ALJ's RFC limited plaintiff to simple and routine tasks with an SVP of 2, and only occasional interaction with the general public and no negotiation, supervision of others, arbitration, or dealing with customer complaints. The ALJ incorporated most of the state agency doctors' opinions within this RFC. However, plaintiff's limitations with concentration, persistence, or pace were not automatically taken care of because the state agency physicians indicated plaintiff could perform simple tasks. As noted above, the restriction of simple, routine tasks and limited interactions with others does not inherently "capture temperamental deficiencies and limitations in concentration, persistence, and pace." **Yurt, 758 F.3d at 859.** When the ALJ determined plaintiff had a moderate difficulty in concentration, persistence, or pace, he was required to explain how they factored into his RFC assessment. His failure to do so is error.

Further, in line with plaintiff's final point, even if the ALJ had appropriately incorporated all of plaintiff's restrictions and adequately formed his RFC, the question he presented to the VE was fundamentally different than the RFC assessment the ALJ found in the end. The question the ALJ presented to the VE had a restriction of tacit instructions with an SVP of 2 or less. The

18

ALJ's final RFC assessment included a limitation of simple and routine tasks with an SVP of 2 or less. While both contain the requirement for an SVP of 2 or lower, tacit does not implicitly equal simple and routine, and limitations involving instructions are not the same as limitations involving tasks. The plain meanings of these restrictions are different and could lead to a change in how the VE assessed plaintiff's work prospects.

As an example of this, plaintiff notes that one of the jobs the VE determined plaintiff was capable of performing, stacker, has an SVP 2 but also requires the ability to carry out detailed but uninvolved written or oral instructions. The Seventh Circuit has held that hypothetical questions must orient the vocational expert to the totality of a claimant's limitations. ***O'Connor-Spinner v. Astrue*, 627 F.3d 614, 619 (7th Cir. 2010).** The Court agrees with plaintiff that task complexity is a significant vocational factor and the ALJ's failure to orient the VE to limitations of simple and routine tasks in his hypothetical is error.

The ALJ is "required to build a logical bridge from the evidence to his conclusions." ***Simila v. Astrue*, 573 F.3d 503, 516 (7th Cir. 2009).** ALJ Robison simply failed to do so here. "If a decision 'lacks evidentiary support or is so poorly articulated as to prevent meaningful review,' a remand is required." ***Kastner v. Astrue*, 697 F.3d 642, 646 (7th Cir. 2012)., citing *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).**

The Court wishes to stress that this Memorandum and Order should not be construed as an indication that the Court believes that plaintiff is disabled

or that she should be awarded benefits. On the contrary, the Court has not formed any opinions in that regard, and leaves those issues to be determined by the Commissioner after further proceedings.

## Conclusion

The Commissioner's final decision denying Jack Merod's application for social security disability benefits is REVERSED and REMANDED to the Commissioner for rehearing and reconsideration of the evidence, pursuant to sentence four of 42 U.S.C. §405(g).

**IT IS SO ORDRED.**

**DATE: July 20, 2016.**

**s/ Clifford J. Proud**

**CLIFFORD J. PROUD**

**UNITED STATES MAGISTRATE JUDGE**
